UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ANDREW L. WILLIAMS,

      Plaintiff,

v.                               Case No. 3:21-cv-792-MMH-MCR

BARRY V. REDDISH, et al.,

      Defendants.

_____

**<u>ORDER</u>**

**I. Status**

Plaintiff Andrew L. Williams, an inmate of the Florida penal system, initiated this action by filing a Civil Rights Complaint (Doc. 1).[1] He proceeds on a Second Amended Complaint (Doc. 34). In the Second Amended Complaint, Williams asserts claims pursuant to 42 U.S.C. § 1983 against seven Defendants: Warden Barry V. Reddish and Florida State Prison (FSP) Correctional Officers S. Thompson, Brian Scott, Jonathan Kyle Aikin,[2]

---

[1] For all documents filed in this case, the Court cites to the document and page numbers as assigned by the Court's Electronic Case Filing System.

[2] Williams referred to this Defendant as "Jonathan Kyle" throughout the Second Amended Complaint, but after service of process, the Court granted Williams' request to correct this Defendant's name to "Jonathan Kyle Aikin." <u>See</u> Order (Doc. 48).

Mitchell Mason, Austin Merritt, and Kenneth Porr.[3] <u>See</u> Second Amended Complaint at 3-5. Williams contends Defendants violated his federal constitutional rights in connection with a cell extraction and placement in strip status while Williams was incarcerated at FSP. <u>Id.</u> at 9-22. Williams also asserts violations of Florida state law against Officers Scott, Aikin, Mason, Merritt and Porr, all of whom were members of FSP's extraction team. <u>Id.</u> at 9. As relief, Williams seeks injunctive relief, monetary damages, and attorney's fees and costs. <u>Id.</u> at 22-23.

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 59; Motion) in support of which Defendants have submitted exhibits (Docs. 59-1 to 59-15).[4] In response, Williams filed a "Statement of Disputed Factual Issues" (Doc. 67; Williams' Statement) and a "Motion in Opposition and Objection(s) to Defendant's [sic] Motion for Summary Judgment" (Doc. 68; Response) along with exhibits (Docs. 68-1 to 68-7) including his own declaration under oath (Doc. 68-3; Williams' Declaration). Defendants filed a reply (Doc. 72; Reply) with an exhibit (Doc. 72-1). Williams subsequently filed a "Reply and Objection(s) to Defendant's [sic] Reply to

---

[3] Williams sues Warden Reddish in his official capacity and all other Defendants in their individual capacities. <u>See</u> Second Amended Complaint at 3-5.

[4] The Court advised Williams of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond to the Motion. <u>See</u> Summary Judgment Notice (Doc. 60).

Plaintiff's Response(s) to Defendant's [sic] Motion for Summary Judgment"
(Doc. 73; Sur-Reply). The Court will strike the unauthorized Sur-Reply
because Williams did not request leave to file it. <u>See</u> Local Rule 3.01(d),
United States District Court, Middle District of Florida (Local Rule(s)). The
Motion is ripe for review.

## II. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he
court shall grant summary judgment if the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be
considered on a motion for summary judgment may include "depositions,
documents, electronically stored information, affidavits or declarations,
stipulations (including those made for purposes of the motion only),
admissions, interrogatory answers, or other materials." Fed. R. Civ. P.
56(c)(1)(A).[5] An issue is genuine when the evidence is such that a reasonable

---

[5] Rule 56 was revised in 2010 "to improve the procedures for presenting and
deciding summary-judgment motions." Rule 56 advisory committee's note 2010
Amends.

> The standard for granting summary judgment remains
> unchanged. The language of subdivision (a) continues to
> require that there be no genuine dispute as to any
> material fact and that the movant be entitled to judgment
> as a matter of law. The amendments will not affect
> continuing development of the decisional law construing
> and applying these phrases.

<u>Id.</u> "[A]lthough the interpretations in the advisory committee['s] notes are not

jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).

---

binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

In citing to Campbell, the Court notes that it does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Guevara v. NCL (Bahamas) Ltd., 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## III. Williams' Allegations[6]

Williams alleges that in early 2018 he was housed in close management (CM) at FSP.[7] See Second Amended Complaint at 9. At the time, Officer Thompson was responsible for managing and supervising all CM housing units at FSP. Id. at 12. Williams alleges that on January 17, 2018, Officer Thompson retaliated against him for submitting two grievances concerning FSP mailroom staff by moving him to an unheated strip cell. Id. According to

---

[6] The allegations recited here are drawn from the Second Amended Complaint.

[7] Williams is presently housed at Columbia Correctional Institution Annex. See Corrections Offender Network, Florida Department of Corrections, available at https://fdc.myflorida.com/OffenderSearch/Search.aspx.

Williams, the strip cell "was exposed to the outside, [and] had a cell temperature between . . . 20°F and 40°F." Id. While in the strip cell, Williams alleges he was deprived of hygiene materials, eating utensils, bedding, all clothing except boxer shorts, and his personal property. Id. at 12-13. Williams contends he remained in the strip cell for seventy-two hours, or until January 20, 2018. Id. at 13. Williams alleges he submitted several grievances regarding his placement in the strip cell, but FSP staff trashed the grievances after notifying Officer Thompson of them. Id.

Next, Williams alleges that on February 9, 2018, Officer Thompson directed FSP's extraction team to take Williams "inside of cell B-1209 out of the view of fixed video cameras, [ ] and to physically and sexually abuse [him] inside of [the] cell." Id. at 16. The FSP extraction team was comprised of Officers Scott, Mason, Merritt, Aikin, and Porr. Id. Williams asserts he was in full body restraints during the extraction, and did not physically or verbally resist the extraction team when they transported him to cell B-1209. Id. at 17. Once inside the cell, Williams contends the extraction team slammed him into the metal bunk; Officer Scott pressed Williams' head into the bunk and poked his fingers repeatedly into Williams' eyes; and other extraction team member(s) penetrated Williams' anus through his boxer shorts and punched and squeezed Williams' testicles. Id. at 17-18. The extraction team then removed Williams' restraints and left the cell. Id. at 19.

According to Williams, Officer Thompson stood at the entrance to cell B-1209 and "blocked the hand held video camera from being able to view and record what occured [sic] inside of [the] cell." <u>Id.</u> at 19-20.

Williams alleges he remained in cell B-1209 until March 6, 2018. <u>Id.</u> at 21. According to Williams, cell B-1209 had "fresh pepper spray all over the floor, walls, bunk, locker, toilet & sink." <u>Id.</u> at 20. Williams states he was only provided boxer shorts to wear despite the cell window being stuck in an open position with the temperatures going as low as 20°F. <u>Id.</u> at 14, 20. Williams also alleges Officer Thompson informed him that his placement in cell B-1209 was intended to "punish [him] for submitting inmate grievances against [Officer] Thompson and other correctional officers." <u>Id.</u> at 14. Williams asserts he sustained physical and mental injuries as a result of the February 9, 2018 cell extraction as well as his placement in strip status from January 17 - 20, 2018, and February 9, 2018, to March 6, 2018. <u>Id.</u> at 14-16, 21.

## IV. Claims in the Second Amended Complaint

In the Second Amended Complaint, Williams asserts: (1) FSP's extraction team violated his Eighth Amendment right to be free from cruel and unusual punishment when they used excessive force during the February

9, 2018 cell extraction, id. at 8;[8] (2) FSP's extraction team violated Florida state law when they committed battery, aggravated battery, and felony battery during the cell extraction, id. at 9; (3) Officer Thompson violated his Eighth Amendment rights when he failed to intervene and stop the extraction team from using excessive force during the cell extraction, id. at 8; (4) Officer Thompson violated his Eighth Amendment right to be free from cruel and unusual punishment when he placed Williams in strip status in January 2018 and after the cell extraction, id. at 7; (5) Officer Thompson violated his First Amendment right when he retaliated against Williams for filing grievances regarding the cell extraction and his placement in strip status, id.; and (6) Warden Reddish violated his Eighth Amendment right to be free from cruel and unusual punishment when he failed to implement measures to stop FSP correctional officers from committing "widespread physical, mental, and sexual abuse of close management (CM) inmates," id. at 6-7.

## V. Summary of the Parties' Arguments

In the Motion, Defendants argue as a threshold matter that Williams failed to exhaust his administrative remedies. See Motion at 7-18. Defendants also raise arguments as to the merits of Williams' claims.

---

[8] Williams alternatively asserts a failure to intervene claim under the Eighth Amendment as to those extraction team member(s) who did not apply excessive force during the cell extraction. See id. at 19.

Specifically as to Williams' Eighth Amendment claims based on the February 9, 2018 cell extraction, Defendants assert that a hand-held video recording of the extraction contradicts Williams' version of the facts, id. at 20-22, and further, that Williams fails to state claims for excessive force or cruel and unusual punishment, id. at 22-29. Insofar as Williams asserts Eighth Amendment claims in connection with his placement in strip status, Defendants contend that Williams has no constitutional right to a specific classification or cell assignment within the prison system and that he fails to state a claim for relief. Id. at 18-20, 27-29. And, as to Williams' First Amendment retaliation claim, Defendants maintain that Williams fails to state a claim for relief. See id. at 29-33.

In addition, Defendants assert in the Motion that the undisputed material facts establish the Correctional Officer Defendants are entitled to qualified immunity, and that Warden Reddish is entitled to Eleventh Amendment sovereign immunity. Id. at 33-37. Finally, Defendants raise three arguments challenging the relief Williams seeks, arguing that: (1) Williams is not entitled to prospective injunctive relief; (2) Williams is not entitled to compensatory damages because he did not suffer a physical injury; and (3) Williams' request for punitive damages is statutorily barred. Id. at 37-45.

In response, Williams argues that he exhausted all available administrative remedies, that there are disputed issues of material fact, and that he is entitled to the relief he seeks. See Response at 2-10; Williams' Declaration; Williams' Statement at 1-3. In their Reply, Defendants counter that there are no genuine disputes of material fact. See Reply at 2-7.

## VI. Analysis

### A. Exhaustion of Administrative Remedies

#### 1. PLRA Exhaustion

The Eleventh Circuit Court of Appeals has held the exhaustion of administrative remedies by a prisoner is "a threshold matter" to be addressed before considering the merits of a case. Chandler v. Crosby, 379 F.3d 1278, 1286 (11th Cir. 2004); see also Myles v. Miami-Dade Cnty. Corr. & Rehab. Dep't, 476 F. App'x 364, 366 (11th Cir. 2012) (noting that exhaustion is a "threshold matter" that must be addressed first) (citation omitted). It is well settled that the Prison Litigation Reform Act (PLRA) requires an inmate wishing to challenge prison conditions to first exhaust all available administrative remedies before asserting any claim under 42 U.S.C. § 1983. See 42 U.S.C. § 1997e(a); Porter v. Nussle, 534 U.S. 516, 532 (2002). A prisoner such as Williams, however, is not required to plead exhaustion. See Jones v. Bock, 549 U.S. 199, 216 (2007). Instead, the United States Supreme Court has recognized that "failure to exhaust is an affirmative defense under

the PLRA[.]" Id. Notably, exhaustion of available administrative remedies is "a precondition to an adjudication on the merits" and is mandatory under the PLRA. Bryant v. Rich, 530 F.3d 1368, 1374 (11th Cir. 2008). Not only is there an exhaustion requirement, the PLRA "requires proper exhaustion." Woodford v. Ngo, 548 U.S. 81, 93 (2006).

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." Pozo,[9] 286 F.3d, at 1024 (emphasis in original).

Woodford, 548 U.S. at 90. And, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Id.

The United States Supreme Court has instructed that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement. The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" Ross v. Blake, 578 U.S. 632, 648 (2016). For an administrative remedy to be available, the "remedy must be 'capable of use

---

[9] Pozo v. McCaughtry, 286 F.3d 1022 (7th Cir. 2002).

for the accomplishment of [its] purpose.'" Turner v. Burnside, 541 F.3d 1077, 1084 (11th Cir. 2008) (quoting Goebert v. Lee Cnty., 510 F.3d 1312, 1322-23 (11th Cir. 2007)). In Ross, the Supreme Court identified three circumstances in which an administrative remedy would be considered "not available." Ross, 578 U.S. at 643. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. Next, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Finally, a remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 644.

Because failure to exhaust administrative remedies is an affirmative defense, Defendants bear "the burden of proving that [Williams] has failed to exhaust his available administrative remedies." Turner, 541 F.3d at 1082. When a defendant raises a failure-to-exhaust defense in a motion for summary judgment, the Court must treat the exhaustion issue as though it was raised in a motion to dismiss, because the determination of whether an inmate exhausted his available administrative remedies is a matter of abatement. Bryant, 530 F.3d at 1374-75; Wright v. Langford, 562 F. App'x 769, 775 (11th Cir. 2014) ("[E]xhaustion of administrative remedies is a

12

matter in abatement and not generally an adjudication on the merits, [thus] an exhaustion defense . . . is not ordinarily the proper subject for a summary judgment; instead, it should be raised in a motion to dismiss, or be treated as such if, [as applicable here, it was] raised in a motion for summary judgment.") (citation and internal quotation marks omitted).

In accordance with Eleventh Circuit precedent, a court must employ a two-step process when examining the issue of exhaustion of administrative remedies.

> After a prisoner has exhausted the grievance procedures, he may file suit under § 1983. In response to a prisoner suit, defendants may bring a motion to dismiss and raise as a defense the prisoner's failure to exhaust these administrative remedies. See Turner, 541 F.3d at 1081. In Turner v. Burnside we established a two-step process for resolving motions to dismiss prisoner lawsuits for failure to exhaust. 541 F.3d at 1082. First, district courts look to the factual allegations in the motion to dismiss and those in the prisoner's response and accept the prisoner's view of the facts as true. The court should dismiss if the facts as stated by the prisoner show a failure to exhaust. Id. Second, if dismissal is not warranted on the prisoner's view of the facts, the court makes specific findings to resolve disputes of fact, and should dismiss if, based on those findings, defendants have shown a failure to exhaust. Id. at 1082-83; see also id. at 1082 (explaining that defendants bear the burden of showing a failure to exhaust).

Whatley v. Warden, Ware State Prison, 802 F.3d 1205, 1209 (11th Cir. 2015). At step two of the procedure established in Turner, the Court can consider facts outside the pleadings as long as those facts do not decide the case and the parties have had sufficient opportunity to develop the record. Bryant, 530 F.3d at 1376; see also Jenkins v. Sloan, 826 F. App'x 833, 838-39 (11th Cir. 2020). In evaluating whether Williams has satisfied the exhaustion requirement, the Court notes that the Eleventh Circuit has determined that a "prisoner need not name any particular defendant in a grievance in order to properly exhaust his claim." Parzyck v. Prison Health Servs., Inc., 627 F.3d 1215, 1218 (11th Cir. 2010) (citations omitted).

## 2. Florida's Prison Grievance Procedure

State law "determines what steps are required to exhaust." Dimanche v. Brown, 783 F.3d 1204, 1207 (11th Cir. 2015); see also Jones, 549 U.S. at 218 (stating that "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion"). The Florida Department of Corrections (FDOC) provides an internal grievance procedure for its inmates. See Fla. Admin. Code R. 33-103.001 through 33-103.018. Generally, to properly exhaust administrative remedies, a prisoner must complete a three-step sequential process. First, an inmate must submit an informal grievance at the institutional level to a designated staff member responsible for the

specific problem. See Fla. Admin. Code R. 33-103.005. If the issue is not resolved, the inmate must submit a formal grievance at the institutional level. See Fla. Admin. Code R. 33-103.006. If the matter is not resolved through formal and informal grievances, the inmate must file an appeal to the Office of the FDOC Secretary. See Fla. Admin. Code R. 33-103.007. However, under certain specified circumstances, an inmate can bypass the informal grievance stage and start with a formal grievance at the institutional level. See Fla. Admin. Code R. 33-103.005(1); 33-103.006(3). An inmate can also completely bypass the institutional level and proceed directly to the Office of the FDOC Secretary by filing a "direct grievance." See Fla. Admin. Code R. 33-103.007(3). Emergency grievances and grievances of reprisal are types of "direct grievances" that may be filed with the Office of the FDOC Secretary. See Fla. Admin. Code R. 33-103.007(3)(a).

Florida Administrative Code Rule 33-103.011 provides time frames for the submission of grievances. Informal grievances must be received within twenty days from the date on which the grieved incident or action occurred. See Fla. Admin. Code R. 33-103.011(1)(a). Formal grievances must be received no later than fifteen days from the date of the response to the informal grievance. See Fla. Admin. Code R. 33-103.011(1)(b). If an inmate is permitted to bypass the informal grievance stage and begin with a formal grievance at the institutional level, the formal grievance must be received no

15

later than fifteen days from the date on which the incident or action being grieved occurred. Id. Grievance appeals to the Office of the FDOC Secretary must be received within fifteen days from the date that the response to the formal grievance is returned to the inmate. See Fla. Admin. Code R. 33-103.011(1)(c).

According to Rule 33-103.014, an informal grievance, formal grievance, direct grievance, or grievance appeal "may be returned to the inmate without further processing if, following a review of the grievance, one or more . . . conditions are found to exist." Fla. Admin. Code R. 33-103.014(1). The rule provides an enumerated list as "the only reasons for returning a grievance without a response on the merits." See Fla. Admin. Code R. 33-103.014(1)(a)-(y). A grievance can be returned without action if it: is untimely; "addresses more than one issue or complaint"; is "so broad, general or vague in nature that it cannot be clearly investigated, evaluated, and responded to"; is "not written legibly and cannot be clearly understood"; is a supplement to a previously-submitted grievance that has been accepted for review; does not "provide a valid reason for by-passing the previous levels of review as required or the reason provided is not acceptable"; or does not include the required attachments. See Fla. Admin. Code R. 33-103.014(1).

### 3. Williams' Exhaustion Efforts

### a. Informal and Formal Grievances

Defendants have provided Williams' grievance records in support of their contention that he failed to exhaust his administrative remedies. Grievance logs show that Williams submitted ten informal grievances between January 22, 2018, and March 19, 2018. See Doc. 59-3 at 2. Defendants submitted copies of two of his informal grievances.[10] On February 14, 2018, Williams submitted an informal grievance (#205-1802-0436) to FSP in which he stated:

> The back window in my cell [B-1209] blasts out cold air into my cell & I need a towel rack & toilet paper holder.
>
> The window isn't closed or sealed @ the 2 window panes @ the top & the toilet paper blows straight out & where the window knob is supposed to be but isn't the wind blows hard. I know everybody says it isn't cold yet everybody has on jackets & the heater doesn't work either in these cells & [a]ll this concrete & steel makes the temp extremely lower than in the rest of the building or outside.

---

[10] None of the parties contend that the remaining eight informal grievances submitted during the time period at issue concern Williams' claims in this case. See Motion at 13; Williams' Declaration at 4 (in his list of grievances, Williams did not include any informal grievances). Of the ten informal grievances, the grievance log shows that two were denied and one was returned without action. See Doc. 59-3 at 2. As to the seven approved informal grievances, two concerned clothing issues ("wants a pair of socks" and "needs blues"); two concerned confiscation of personal property (informal grievance #205-1802-0533 described above, and "off dc"); and three concerned facility conditions (informal grievance #205-1802-0436 described above, "desk hanging off wall," and "leaking water in pipe"). Id.

Doc. 59-3 at 14. On February 23, 2018, FSP approved the informal grievance with a note stating "replaced window knob[,] adjusted sides of window." Id.

Next, on February 18, 2018, Williams submitted an informal grievance (#205-1802-0533) to FSP, stating:

> I've been off property restriction since 2/12/18 & still haven't received my property nor my property receipt.

Doc. 59-3 at 17. On March 1, 2018, FSP approved the informal grievance, stating: "A check of the property restriction bin will be done. If property belonging to you is present, it will be returned." Id.

As for formal grievances, the grievance log indicates that Williams submitted eight formal grievances between January 22, 2018, and March 9, 2018. See Doc. 59-3 at 11. Five of the formal grievances were denied, and three were returned without action. Id. Because the formal grievances log contains no comments, it is not readily apparent whether any of these formal grievances concerned Williams' claims in this case. With their Motion, Defendants submitted only one of the formal grievances. In that formal grievance (#1802-205-296), Williams stated:

> My property was taken from me when I was placed on strip 2/9/18 on F-wing[.] I have not received my property or even a property receipt as of yet & today is 2/22/18[.] yall [sic] are denying me due process but that's nothing new for FSP security personnel.

18

> Administrative relief: Send me my property or @
> least for now send my property receipts.

Doc. 59-3 at 15. On February 28, 2018, FSP returned the formal grievance

without action, stating in pertinent part:

> Your request for administrative remedy to this office
> is in non-compliance with Chapter 33-103[.] [Y]ou
> have not allowed adequate time for a response to be
> given. This issue is currently pending disposition on
> informal log # 205-1802-0533 received on 02/19/2018.
>
> Your request for administrative remedy is being
> returned without action.

Doc. 59-3 at 16. In his Declaration, Williams lists two other formal grievances

that he asserts involved the claims raised in this lawsuit, but offers no other

information regarding the content of those grievances. Williams' Declaration

at 4.

### b. Grievance Appeals

In support of their argument that Williams failed to exhaust his

administrative remedies, Defendants also submitted the declaration of FDOC

Grievance Coordinator Rebecca Owens, see Doc. 59-7, and the declaration of

Alan McManus, Bureau Chief of FDOC's Bureau of Policy Management and

Inmate Appeals, see Doc. 59-4. According to Owens, Williams submitted

twenty-one grievance appeals between January 31, 2018 and June 30, 2018.

See Doc. 59-7 at 3-7. McManus avers that eight of these grievance appeals

were related to the claims in this case. See Doc. 59-4 at 2. The eight grievance

appeals and the responses thereto are set forth below.

One of the grievance appeals addressed the February 9, 2018 cell

extraction. Specifically on February 18, 2018, Williams submitted a grievance

appeal (#18-6-08110) to the Office of the FDOC Secretary in which he stated:

> "Grievance of Reprisal"
> This direct grievance is bypassing all
> institutional channels due to the fact that [I]'ve
> already been retaliated upon for writing other
> grievances dealing w/ the same people & I feel I will
> be adversly [sic] affected again if I go to the
> institution w/ this "Grievance of Reprisal." Therefore
> I submit this "Grievance of Reprisal" directly to the
> Secretary of Fla. DOC per Ch. 33-103.
>
> (In concise version) On 2/9/18 L.t t.
> [T]hompson[11] came to the cell I was housed in
> F1317s (@ Fla. State Prison) along w/ Sgt. Anderson
> sometime in the morning & told me to give him my
> shit – [a]ll my shit. I asked [Thompson] what did I do
> & he then walk[ed] off w/ Sgt [A]nderson. [A] few
> minutes pass & I start to get my stuff together for
> property restriction. [Thompson] comes back w/ the
> use of force camera & his gang, he then speaks to the
> camera. I then strip down & cuff up & am immediatly
> [sic] grabbed by 2 (two) people from the extraction
> team[,] Sgt. [B]rian Scott being one, I don't know the
> other. (It should be duly noted Sgt. [B.] Scott &
> [Thompson] placed me on strip in F-wing on 1/17/18
> for writing grievances on the mail room). I was
> immediatly [sic] taken to B(ravo) wing which is D/C
> cell 1209 & as they violated & took me into the cell &

---

11 Because Williams refers to Thompson differently throughout his grievances
(i.e., "L.t. t. Thompson", "L.t. Thompson"), the Court will use [Thompson] for ease of
reference.

slammed me on the bunk face down fully restrained[.] Sgt. Scott put his hand on my head & leaned all his weight down on my face & used his thumb to poke me in my right eye & then push my eye in & apply constant pressure saying "you still haven't learnt about writing grievances huh?" Someone hit & then pulled on my scrotum sack when they flip[ped] me over saying "we don't like grievances," they flipped me back on my stomach & someone put their hand in between my butt & said "Just making sure you don't have any contraband hidden fagg." All the while [Thompson] is blocking the camera's view which is a violation. They leave out, close the door, remove the cuffs & nurse [D]anley comes & looks @ me thru the window. I tell her I want to call a P.R.E.A. & staff abuse & told her some of what happened & told her look at my [r]ed [s]wollen eye (right) & swollen left side of face. She walked off. Nobody followed procedure. I was left in a cell w/ nothing in it no hygien [sic] or anything the toilet paper was thrown in the toilet by someone on the team as they left out & everything I touched or sat on burned from chemical agents in the cell & [illegible] properly cleaned the day before & the back window is broke. I suffered for 12 hrs & still haven't been seen by anyone @ all about nothing. All injuries have cleared up now.

Doc. 59-4 at 8. On February 28, 2018, the Office of the FDOC Secretary

provided the following response:

> Your request for administrative review has been received, reviewed, and evaluated.
>
> Record reflects that the Use of Force on 02/09/2018 was previously referred to the Office of the Inspector General for review.

> Your issue regarding placement on property restriction is a separate issue and should be grieved as such, also, being initiated at the appropriate level.
>
> As this process was initiated prior to the receipt of your appeal, your request for action by this office is denied.

Id. at 9.

Dissatisfied with the above response, Williams submitted a grievance appeal to address the FDOC Secretary's handling of his grievance appeal #18-6-08110. Specifically on March 26, 2018, Williams submitted a grievance appeal (#18-6-14216) in which he stated:

> Direct Grievance
>
> No matter how many informal & formal grievances us prisoners @ FSP turn in pertaining to the grievance officers & warden trashing grievances the institution &/or [T]allahassee has still not fixed the situation. So per Ch. 33-103.011 because my other grievance(s) haven't been answered I now proceed to the next level.
>
> On or about 2/19/18 I submitted a grievance of reprisal pertaining to 2/9/18 (see log# 18-6-08110)[.] [I]n the body of this grievance I reported P.R.E.A. claims & staff abuse claims, the two procedures for both of these claims are similar because the[y] must be reported immediately & investigated just as fast. When I reported my claims to Nurse C. [D]anley on 2/9/18 through the door which was a [HIPPA (sic) violation] I refuse to come out on that shift because the ones who victimized me would have to escort me again & I was in fear of my life & these things happening again. I was supposed to be pulled out the next day or by different staff members. Whoever read & responded to log# 18-6-08110 was to immediately

22

> report those claims & get me pulled out to medical &
> have them document "All" injuries & what happened,
> this wasn't done violating P.R.E.A. 28 C.F.R. Part
> 115 & FDC Procedure 602.053. "All staff members,
> contractors & volunteers are required BY LAW to
> report any incident(s) or allegation(s) of sexual abuse,
> sexual battery or sexual harassment immediately. . .
> This includes knowledge of or the receipt of
> information, written or verbal." The same is for use of
> force or abuse ([staff abuse]) per Ch. 33-601... None
> of this was done & if it was[,] nobody has come to see
> me & all of my physical visual injuries are clear but
> not the ones you cannot see though. Anyhow
> procedure, protocol & Chapter 33 F.A.C. was violated.

Doc. 59-4 at 20. On April 5, 2018, the Office of the FDOC Secretary returned

this grievance appeal because it addressed more than one issue or complaint.

Id. at 21. The response stated:

> Your request for administrative appeal is in non-
> compliance with Chapter 33-103, Inmate Grievance
> Procedure, which states, "each grievance must
> address only one issue or complaint." Your current
> request for administrative appeal addresses more
> than one issue and/or complaint.
>
> You address the grievance process, complaints of
> excessive force by staff and HIPAA violations. Your
> allegation of excessive force was addressed in the
> response to appeal # 18-608110 advising you that it
> was previously reported to the Office of the Inspector
> General. Once your allegation has been reported this
> office is void of any further responsibility. You may
> re-file your grievance process and HIPAA issue
> separately at the appropriate level. Contact was
> previously made with institution grievance staff who
> denied trashing grievances and stated that they
> process grievances that they receive.

23

> Based on the foregoing information, your grievance
> appeal is being returned.

Id.

Williams also submitted a grievance appeal regarding his placement in strip status on January 17, 2018. Specifically, on February 14, 2018, Williams submitted a grievance appeal (#18-6-08683) to the Office of the FDOC Secretary, in which he stated:

> I've been placing grievance after grievance pertaining
> to cruel & unusual punishment[,] strip w/o nothing in
> cell or on me except boxers in @ the institutional level
> & they've never responded w/in the given time frame
> let alone issued a receipt. So per Ch. 33-103 that
> gives me the right to continue on to the next level if
> no one answers, this is what im [sic] doing & that's
> the reason there's no paper work attached . . . .
>
> On 1/17/18 on F-Wing 1300 side approx. 1.45 p[m]
> Sgt. [B]rian Scott (who was working as F-wing dorm
> supervisor) came to the cell I was housed in F-1317s
> w/ [Thompson] & both of them told me to pack my
> s*** im [sic] going on property restriction, I asked
> why & [Thompson] stated "you gone give me your
> sh** or what?" I began handing my property out the
> door, state property & personal property. I asked "do
> I atleast get to keep a blanket because it'll be in the
> 20s tonight & the window is open?" Sgt. Scott told
> me: "think about writing the ladies in the mailroom
> up again while you freeze your b****s off."
> [Thompson] told me im [sic] moving too slow & to cuff
> up then he told Sgt. Scott to go call a bunch of people.
> A bunch of people came they took me to the upstairs
> 1300 side shower & litterally [sic] stripped my cell of
> everything that wasn't cemented or bolted down i.e.
> no toilet paper, soap, toothbrush, toothpaste, wash
> rag, asthma inhaler(s) nothing but me in my boxers.

> That night it was so extremely cold because the
> exhaust fans were on full blast too. I tried to fit
> myself inside of my foot locker. The temperature was
> a record for Fla 22° w/ a wind chill factor of 16! My
> finger nails & toe nails were blue & I was litterally
> [sic] crying because it was so cold! I asked for a
> blanket one time but once this new officer [saw] I
> didn't have a mattress or anything else he kept going.
> Sgt. Scott & [Thompson] caused me unnecessarry
> [sic] pain and suffering @ the same time violating the
> 8th United States Constitutional Amendment to be
> free from cruel & unusual punishment. Both of these
> were done w/ malicious indifference & with malicious
> intent to cause pain & suffering.

Doc. 59-4 at 10. On March 1, 2018, the Office of the FDOC Secretary returned

this grievance appeal without action because (1) Williams did not "first

submit [a] grievance at the appropriate level at the institution" or provide a

valid reason for not doing so, and (2) the grievance appeal addressed more

than one issue. Id. at 11.

Three of Williams' other eight grievance appeals concerned allegations

of retaliation. In grievance appeal #18-6-08999, dated February 22, 2018,

Williams stated:

> This Grievance of Reprisal is a [d]irect [g]rievance to
> the Secretary due to the adverse affects [sic] all other
> grievances have been met with per Ch. 33-103[.] I am
> bypassing all institutional channels do [sic] to the
> nature of this grievance & the [r]eprisal I've been
> receiving from the same person.
>
> On 2/19/18 I turned in a grievance of [r]eprisal on
> [Thompson] & Sgt. [B.] Scott[.] [L]ater on that same
> exact day this same [Thompson] placed me on strip

25

again. This same [Thompson] has placed me on strip 3 times in 33 days & has orchestrated the writing of 5 DRs & all of the strips. If nobody can see his direct involvment [sic] then they're blind, he not only has the grievance people take the grievances & give them to him but he tells them which ones to destroy or has others do it for him. Since I've been grieving both security personnel [I]'ve gotten no response to those grievances & no receipts. Just retaliation in the form of strip/DRs. But this person in [T]allahasee doesn't accept anything as retaliation or anything else this C. [N]eel.

Doc. 59-4 at 12. In grievance appeal #18-6-10631, dated February 27, 2018,

Williams stated:

> This "Grievance of Reprisal" is in accord w/ Ch. 33-103...& per Ch. 33-103...I bypass all institutional channel(s) & I file directly w/ the Secretary of FDOC due to the [FACT] (alteration in original) that every time I grieve the people [I]'m grieving [Thompson] comes & places me on strip (personal & state property restriction) & threatend [sic] w/ bodily harm e.g. 2/9/18 [Thompson] & Sgt. [B]rian Scott retaliated on me for grieving them for retaliating on me & writing the mail room ladies up by placing me on strip in F-Wing & immediately moving me to B-wing (B1209) where the team (including Sgt. [B]rian Scott) committed cruel & unusual punishment & sexual misconduct while [Thompson] block[ed] use of force camera w/ his back. I was not permitted out of my cell until my injuries healed, yet, they're constantly placing me on strip so [I]'m still not allow[ed] out of my cell. They don't even answer my sick calls & they're destroying my personal property.
>
> ARGUMENT ("STATEMENT OF FACTS")
> On 2/19/18 [Thompson] placed me on strip again for the grievances I placed in that morning telling me "I know of every grievance you put in that box, it was

[no] help, give me all your stuff." I was on strip all the way up till 2/26/18 when [Thompson] took my mattress, I already didn't have anything but my matt from 2/19/18 when he placed me on strip[.] So this time he placed me on straight metal & concrete which is damaging my hip bones & something in my right bicep & neck; causing me unnecessary pain & suffering. Everyday I asked about my bedroll & clothes but was ignored by [Thompson] from the 19 of Feb till the 26 of Feb. Also, the prolonging of my strip status is/was not justified penologically @ all just pure retaliation.

Id. at 16. And, in grievance appeal #18-6-10629, dated March 4, 2018, Williams stated:

This Grievance of Reprisal is in accordance w/ Ch. 33-103 . . . & per Ch. 33-103. . . I bypass all institutional channel(s) & I file directly [to the] Secretary of FDOC due to the [Fact] (alteration in original) that every time I grieve [Thompson] or a situation he created[,] he comes & places me on strip[,] threatens me w/ bodily harm.

On the 19th of February, I was retaliated on by [Thompson] fo[r] filing grievance(s) on him (Since Jan 17, 2018 for placing me on strip in 22° weather in nothing but boxers for grieving the ladies in the mailroom) by him placing me on strip. He left me w/ only a mattress in my [cell] & me in boxers (nothing else), I was suppose[d] to come off of str[ip] in 72 hrs but was left on strip until 2/26/18 when he did not [give] me my bedroll, clothes & property back but he came & took my matt [sic] leaving me on metal & concrete torturing me because [I]'ve told[.] [T]he outside back window does not close all the way so cold air comes in[.] On Thursday March 1, 2018 I was given a partial bed roll & some clo[thes] but no mattress. As of the writing of this grievance I still don't have a matt [sic], I am being retaliated on &

> tortured the treatment that is b[eing] dealt is cruel & unusual punishment & violates my federally protected right to be free from such punishment. This retaliation w/ such treatment has b[een] ongoing since Jan. 17, 2018 & has yet to cease. The institution (FSP) is throwing away all my grievances dealing with anything pertaining to retaliation, strip, stolen property, sexual misconduct, staff abuse, etc…if it deals with [Thompson] & Sgt. [B]rian Scott the grievances are never seen again by me. But the retaliation comes w/out a doubt.

Id. at 14. In response to the above three grievance appeals, the Office of the FDOC Secretary did not accept them as grievances of reprisal, and instead returned them without action because Williams did not "first submit [a] grievance at the appropriate level at the institution" or provide a valid reason for not doing so. Id. at 13, 15, 19.

Lastly, two of Williams' grievance appeals concerned Williams' allegations of widespread abuse of CM inmates and FSP's handling of grievances. First, on March 19, 2018, Williams submitted a grievance appeal (#18-6-15170) in which he stated:

> I am proceeding to the next level of the grievance process w/out any attachment(s) due to the [FACT] (alteration in original) that I've been placing grievance after grievance into the grievance box pertaining to the widespread systematic abuse of CM inmates by security personnel @ FSP since January 2018[,] but they ([administration]) keeps trashing them. Therefore per Ch. 33-103.011(4) I am proceeding to the next level, the time allotted to respond has expired, I didn't sign for a(n) extension &

no response has come. I now proceed to the next step as permitted by the FAC aforementioned.

Since 1/1/1/18[,] I Andrew L. Williams have personally witnessed & have also been personally subjected to the widespread systematic physical, mental & sexual abuse of us CM inmates by security personnel & the hits sent by contracted personnel such as mental health, medical, mailroom & classification. This abuse is a constant daily evil that occurs @ Fla. State prison w/ no remorse or recourse for the wrongs done to us, which is repugnant to the conscience of humankind. All of the personnel mentioned maliciously & sadistically subjects us to cruel & unusual punishment w/ the sole purpose & intent of inflicting physical & mental pain & suffering unnecessarily w/ out any penological justification nor in good faith effort to restore discipline. I've been victimized by this widespread abuse in all ways but never received any help @ all nor treatment. Just retaliation (more abuse & threats of more bodily harm).

Administrative Remedy: I've been trying to get the institution to hold the video and audio for (1/17/18 approx 1 p for F-wing 1300 side) (2/9/18 F-wing 1300 side approx. 8:45 a, 2/9/18 B-wing approx. 9:30 a 2nd floor) (2/19/18 B-wing 2nd floor approx. 1 p) (2/26/18 Bwing approx. 1:15 2nd floor) (2/24/18 Bwing 2nd floor approx 5:45 p) per procedure 602.033(4) for future litigation purposes & I ask the same here as well as these problems be corrected.

Doc. 59-4 at 24. On April 12, 2018, the Office of the FDOC Secretary returned the grievance appeal without action for failing to submit the grievance at the appropriate level. Id. at 25. The response stated:

Your request for administrative appeal is in non-compliance with the Rules of the Department of

Corrections, Chapter 33-103, Inmate Grievance Procedure. The rule requires that you first submit your grievance at the appropriate level at the institution. You have not done so or you have not provided this office with a copy of that grievance, nor have you provided a valid or acceptable reason for not following the rules.

When making allegations of staff misconduct, provide all pertinent information such as names, dates, times, places and specific details.

Contact was made with institution grievance staff who denied disposing of grievances and stated that they process grievances that they receive. Our records reflect that all formal grievances received from you involving complaints against staff have been responded to and returned to you.

Upon receipt of this response, if you are within the allowable time frames for processing a grievance, you may resubmit your grievance at your current location in compliance with Chapter 33-103, Inmate Grievance Procedure.

Based on the foregoing information, your appeal is returned without action.

Id. Second, on March 25, 2018, Williams submitted a grievance appeal (#18-6-14218) in which he stated:

Direct Grievance
There is widespread physical, mental and sexual abuse of close management inmates by correctional officers of ALL ranks @ . . . FSP; and FSP Warden B.V. Reddish has failed and continues to fail to remedy that abuse, or has failed to implement reasonable penological measures to stop that abuse. As a result, FSP correctional officers physically,

30

> mentally and sexually abused me during a series of recent events that just ended in March 2018.
>
> NOTE: I submitted several informal and formal grievances regarding the above to the FSP grievance collector, however, the grievance officers . . . say that they never received those grievance[s]. The fact of the matter is that [the grievance officers] have a custom to trash grievances alleging abuse by correctional officers. I need help. My physical and mental well-being continue to be @ risk of further abuse.

Id. at 22. On April 5, 2018, the Office of the FDOC Secretary returned this grievance appeal for addressing more than one issue. Id. at 23. The response stated:

> Your request for administrative appeal is in non-compliance with Chapter 33-103, Inmate Grievance Procedure, which states, "each grievance must address only one issue or complaint." Your current request for administrative appeal addresses more than one issue and/or complaint.
>
> Your issues involve complaints against staff and the grievance process. Each issue should be addressed separately and should be initiated at the informal level. Contact was previously made with institution grievance staff who denied trashing grievances and stated that they process grievances that they receive. A review of your grievance record does not refute their statement.
>
> When making allegations of staff misconduct, provide all pertinent information such as names, dates, times, places and specific details.
>
> Based on the foregoing information, your grievance appeal is being returned.

Id.

The Court notes that Williams lists four other grievance appeals (#18-6-05582, #18-6-07520, #18-6-08682, and #18-6-06575) that he maintains are also relevant to this lawsuit. See Williams' Declaration at 4. Williams does not, however, provide any details regarding the content of these grievances.

### 4. Turner Step One

Under the first step of the Turner analysis, the Court must review the allegations in the Motion and Response and accept as true Williams' allegations. See Whatley, 802 F.3d at 1209. If Williams' allegations show a failure to exhaust, then dismissal would be appropriate. Id.

Williams asserts that he exhausted his administrative remedies by submitting several grievances regarding the claims at issue in this lawsuit. See Williams' Declaration at 4, 9. Williams also alleges that FSP staff obstructed the grievance process by "trashing [his] filed grievances after informing []Defendant S. Thompson," thereby rendering the grievance process unavailable to him. Id. at 5; see also Response at 3 (alleging that FSP officials have been "destroying grievances pertaining to staff abuse, sexual misconduct, and other serious grievances while allowing petty grievances to be processed . . ., creating a situation where exhaustion of the grievance process is nigh impossible and/or otherwise impeded[.]"). Accepting Williams' view of the facts as true, the Court cannot dismiss his claims at the first step

of the Turner analysis. See Jackson v. Griffin, 762 F. App'x 744, 746 (11th Cir. 2019) (holding disputes about availability of administrative remedies are questions of fact that can bar dismissal at Turner's first step).

### 5. **Turner** Step Two

As dismissal would not be appropriate based on Williams' allegations, the Court will proceed to Turner's second step and make specific findings to resolve the disputed factual issues related to exhaustion. Here, the Court initially finds that Williams exhausted his administrative remedies as to his claims concerning the use of force during the February 9, 2018 cell extraction. As to these claims, the grievance records establish that Williams bypassed the institutional level and proceeded directly to the Office of the FDOC Secretary by submitting grievance appeal #18-6-08110. See Doc. 59-4 at 8. Although the FDOC Secretary denied this grievance appeal, the FDOC Secretary's response expressly stated that the "Use of Force on 02/09/2018" had been referred to the Office of the Inspector General (OIG). Id. at 9. Thereafter, in response to a subsequent grievance appeal (#18-6-14216), the FDOC Secretary confirmed that Williams was not required to do anything further to grieve these claims:

> Your allegation of excessive force was addressed in the response to appeal # 18-608110 advising you that it was previously reported to the Office of the Inspector General. Once your allegation has been

reported this office is void of any further
responsibility.

<u>Id.</u> at 21. Because Williams' allegations regarding the use of force during the

cell extraction were referred to the OIG, the Court concludes that Williams

sufficiently exhausted his administrative remedies as to those claims.[12] <u>See</u>

<u>Hersh v. Scott</u>, No. 3:22-cv-408-BJD-LLL, 2023 WL 2242551, at *3 (M.D. Fla.

Feb. 27, 2023) ("[W]hen a prisoner files a grievance before filing a federal

action and, in response to that grievance, is informed that his allegations

have been reported for investigation—to the IG's Office or another

authority—then, regardless of whether the responding official 'denies' or

'approves' the grievance, the prisoner may be deemed to have exhausted his

administrative remedies under the PLRA."); <u>Lanier v. Smith</u>, No. 3:08-cv-

833-J-12JRK, 2009 WL 1758904, at *1 (M.D. Fla. June 19, 2009) (exhaustion

requirement satisfied where the plaintiff was informed in three grievance

responses that the matter had been referred to the OIG for review and

consideration).[13]

---

[12] In their Motion, Defendants seemingly acknowledge that Williams satisfied
his exhaustion obligation as to his allegations concerning the cell extraction. <u>See</u>
Motion at 14 ("The answer [Williams] received [to grievance appeal #18-6-08110]
was only to the extent that it addressed his allegations of excessive use of force and
was done so out of an abundance of caution to ensure that the allegation had been
referred to the Office of the Inspector General."); <u>id.</u> at 17 ("[Williams] had no
approved informal or formal grievances and no approved or denied grievance
appeals concerning the claims in his complaint, except for excessive use of force.").

[13] The Court notes that although decisions of other district courts are not
binding, they too may be cited as persuasive authority. <u>See</u> <u>Stone v. First Union</u>

As for Williams' claims based on his placement on property restriction, his allegations of retaliation, and his allegations concerning widespread abuse of CM inmates, the Court finds these claims are unexhausted because Williams did not comply with the FDOC's sequential three-step grievance process as to them. See Dimanche, 783 F.3d at 1211 (recognizing that the FDOC uses a three-step sequential process for inmate grievances that includes an informal grievance, formal grievance, and appeal); Bryant, 530 F.3d at 1378 ("To exhaust administrative remedies in accordance with the PLRA, prisoners must 'properly take each step within the administrative process.'") (quoting Johnson v. Meadows, 418 F.3d 1152, 1158 (11th Cir. 2005)). The record before the Court contains no evidence that Williams submitted any informal grievances regarding his placement on property restriction/strip status (either in January 2018 or after the cell extraction), his allegations of retaliation, or his allegations concerning widespread abuse of CM inmates. See Pavao v. Sims, 679 F. App'x 819, 825 (11th Cir. 2017) (finding plaintiff's efforts to exhaust were insufficient because he failed to file an informal grievance and therefore, "did not comply with the sequential three-step grievance procedure"). And although Williams attempted to bypass the institutional level and submit grievance appeals regarding these claims,

---

Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects.").

his grievance appeals were either denied or returned without action due to Williams' failure to comply with FDOC's procedural requirements. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." <u>Woodford</u>, 548 U.S. at 90. Two of Williams' grievance appeals (#18-6-14216 and #18-6-14218) were returned for addressing more than one issue and/or complaint. <u>See</u> Doc. 59-4 at 21, 23. Another five grievance appeals (#18-6-15170, #18-6-08683, #18-6-08999, #18-6-10629, and #18-6-10631) were returned because Williams did not first submit a grievance at the appropriate level at the institution or provide a valid reason for not doing so. <u>Id.</u> at 11, 13, 15, 19, 25. And in Williams' eighth grievance appeal (#18-6-08110), while his use of force allegations were referred to the OIG, the FDOC Secretary stated that Williams' remaining allegations in the appeal, which concerned his placement on property restriction, were a "separate issue" that needed to "be grieved as such . . . and initiated at the appropriate level." <u>Id.</u> at 9. Because Williams did not complete the FDOC's sequential grievance process and because his grievance appeals did not comply with the FDOC's grievance procedures, the Court finds that Williams did not exhaust his claims based on his placement on property restriction, retaliation, or widespread abuse of CM inmates. <u>See</u> <u>Johnson</u>, 418 F.3d at 1157-58 ("[U]nless the prisoner completes the administrative process by following the

rules the state has established for that process, exhaustion has not occurred." (quoting Pozo, 286 F.3d at 1023)).

To the extent that Williams suggests any failure to exhaust should be excused because the grievance process was unavailable to him, that argument fails. "While the burden is on the defendant to show an available administrative remedy, once that burden has been met, the burden of going forward shifts to the plaintiff, who, pursuant to Turner, must demonstrate that the grievance procedure was 'subjectively' and 'objectively' unavailable to him." Geter v. Baldwin State Prison, 974 F.3d 1348, 1356 (11th Cir. 2020) (citing Turner, 541 F.3d at 1085); id. at 1356 n.14 ("But once the [prison official] has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him." (quoting Rinaldi v. United States, 904 F.3d 257, 268 (3d Cir. 2018))). Here, Williams asserts grievance officials at FSP thwarted his grievance efforts by destroying his grievances. See Response at 3. This self-serving and unsupported assertion, however, is belied by Williams' history of filing grievances. During the time period at issue, Williams submitted thirty-nine grievances. See Docs. 59-4 and 59-7. All of these grievances produced responses. Id. Williams' abundant grievance record during the relevant time period undercuts his assertion that his efforts were thwarted by prison officials. See Whatley v. Smith, 898 F.3d 1072, 1083 (11th Cir. 2018) (holding

37

the district court properly considered the plaintiff's history of filing grievances "as evidence that the defendants did not make administrative remedies unavailable to him or lose or destroy his grievances."). Williams therefore fails to demonstrate that the grievance process was unavailable to him.

Based on the foregoing, the Court concludes that the Motion is due to be granted to the extent Williams failed to exhaust: (1) his Eighth Amendment claim against Officer Thompson for placing Williams on strip status from January 17 - 20, 2018, and after the cell extraction from February 9, 2018, to March 6, 2018; (2) his First Amendment retaliation claim against Officer Thompson; and (3) his Eighth Amendment claim against Warden Reddish. These claims are dismissed without prejudice and the Clerk is directed to terminate Warden Reddish as a Defendant. In light of Warden Reddish's dismissal, Williams' request for injunctive relief—which he sought solely against Warden Reddish—is due to be dismissed as moot.

Williams may proceed on his exhausted claims, which are:

(1) FSP's extraction team violated Williams' Eighth Amendment right to be free from cruel and unusual punishment when they used excessive force during the cell extraction, or alternatively, when they failed to intervene and stop other team members from using force during the extraction;

38

(2) FSP's extraction team violated Florida state law when they committed battery, aggravated battery, and felony battery during the cell extraction; and

(3) Officer Thompson violated Williams' Eighth Amendment rights when he failed to intervene and stop the extraction team from using excessive force during the cell extraction.

The Court will now turn to Defendants' remaining arguments in their Motion regarding Williams' exhausted Eighth Amendment claims.

## B. Merits of Exhausted Eighth Amendment Claims[14]

### 1. Applicable Law

In Sconiers v. Lockhart, 946 F.3d 1256, 1265 (11th Cir. 2020), the Eleventh Circuit reviewed "the principles applicable to Eighth Amendment excessive-force and sexual-assault" claims. In doing so, the Court instructed:

> The Eighth Amendment, among other things, prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. As the Supreme Court has explained, "the unnecessary and wanton infliction of pain" qualifies under the Eighth Amendment as proscribed "cruel and unusual punishment." Hudson v. McMillian, 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Nevertheless, the Supreme Court has instructed that what rises to the level of an "unnecessary and wanton infliction of pain" differs

---

[14] In their Motion, Defendants do not separately address the merits of Williams' state law claims for battery, aggravated battery, and felony battery. As such, the Court's merits analysis is limited to the exhausted Eighth Amendment claims.

based on the type of Eighth Amendment violation alleged. Id.

Since [the plaintiff] asserts excessive-force and sexual-assault claims, "the core judicial inquiry" requires [the Court] to consider "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins, 559 U.S. at 37, 130 S.Ct. 1175 (citation and quotation marks omitted).[15] This standard requires a prisoner to establish two elements – one subjective and one objective: the official must have both "acted with a sufficiently culpable state of mind" (the subjective element), and the conduct must have been "objectively harmful enough to establish a constitutional violation." Hudson, 503 U.S. at 8, 112 S.Ct. 995 (cleaned up).

With respect to the subjective element, "to have a valid claim on the merits of excessive force in violation of [the Eighth Amendment], the excessive force must have been sadistically and maliciously applied for the very purpose of causing harm." Johnson v. Breeden, 280 F.3d 1308, 1321 (11th Cir. 2002); see also Thomas v. Bryant, 614 F.3d 1288, 1304 (11th Cir. 2010).

As for the objective component of an excessive-force violation, it focuses on whether the official's actions were "harmful enough," Hudson, 503 U.S. at 8, 112 S.Ct. 995, or "sufficiently serious," Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), to violate the Constitution. "Not every malevolent touch by a prison guard gives rise to a federal cause of action." Wilkins, 559 U.S. at 37, 130 S.Ct. 1175. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of

---

[15] Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam).

> a sort repugnant to the conscience of mankind." <u>Id.</u> at 37-38, 130 S.Ct. 1175. Instead, the Eighth Amendment prohibits force that offends "contemporary standards of decency," regardless of whether "significant injury is evident," though the extent of injury may shed light on the amount of force applied or "whether the use of force could plausibly have been thought necessary." <u>Wilkins</u>, 559 U.S. at 37, 130 S.Ct. 1175 (citation and internal quotation marks omitted).

<u>Id.</u> at 1265-66; <u>see also</u> <u>McKinney v. Sheriff</u>, 520 F. App'x 903, 905 (11th Cir. 2013) (per curiam). In determining whether an officer's use of force was applied maliciously and sadistically for the purpose of causing harm, courts consider five distinct factors:

> (1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them.

<u>Campbell v. Sikes</u>, 169 F.3d 1353, 1375 (11th Cir. 1999) (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 321 (1986); <u>Hudson</u>, 503 U.S. at 7). When considering these factors, courts must "give a 'wide range of deference to prison officials acting to preserve discipline and security,' including when considering '[d]ecisions made at the scene of a disturbance.'" <u>Cockrell v. Sparks</u>, 510 F.3d 1307, 1311 (11th Cir. 2007) (quoting <u>Bennett v. Parker</u>, 898 F.2d 1530, 1533 (11th Cir. 1990)).

Notably, a lack of serious injury, while not dispositive, is relevant to the inquiry. Wilkins v. Gaddy, 559 U.S. 34, 38 (2010) (per curiam); Smith v. Sec'y, Dep't of Corr., 524 F. App'x 511, 513 (11th Cir. 2013) (per curiam). The United States Supreme Court has explained:

> "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." Ibid.[16] (quoting Whitley, supra, at 321, 106 S.Ct. 1078). The extent of injury may also provide some indication of the amount of force applied. . . . An inmate who complains of a "'push or shove'" that causes no discernible injury almost certainly fails to state a valid excessive force claim. Id. at 9 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).[17]
>
> Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.

Wilkins, 559 U.S. at 37-38. The Eleventh Circuit has explained:

> A plaintiff who suffers only de minimis injury does not necessarily lack a claim for excessive force under § 1983. Stephens,[18] 852 F.3d at 1328 n.33; Saunders v. Duke, 766 F.3d 1262, 1270 (11th Cir. 2014). However, the resulting injuries can be evidence of the kind or degree of force that was used by the officer.

---

[16] Hudson, 503 U.S. at 7.

[17] See Johnson, 481 F.2d at 1033 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.").

[18] Stephens v. DeGiovanni, 852 F.3d 1298 (11th Cir. 2017).

See Crocker v. Beatty, 995 F.3d 1232, 1251 (11th Cir. 2021).

Charles v. Johnson, 18 F.4th 686, 700 (11th Cir. 2021).

Even if not actively involved in a use of force, "an officer can be liable for failing to intervene when another officer uses excessive force." Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 924 (11th Cir. 2000); Ensley v. Soper, 142 F.3d 1402, 1407-08 (11th Cir. 1998). This liability, however, only arises when the officer is able to intervene and fails to do so. See Keating v. City of Miami, 598 F.3d 753, 764 (11th Cir. 2010); see also Fils v. City of Aventura, 647 F.3d 1272, 1290 n.21 (11th Cir. 2011); Brown v. City of Huntsville, 608 F.3d 724, 740 n.25 (11th Cir. 2010) ("Because the relevant events happened so quickly, the record does not reflect any point at which [the officer] could have intervened to prevent [another officer's] use of excessive force. . . .").

## 2. Analysis

Defendants argue in their Motion that they are entitled to summary judgment because (1) a hand-held video recording of the extraction contradicts Williams' version of the facts, see Motion at 20-29, (2) the undisputed facts establish that they did not apply excessive force during the extraction, id. at 22-29, and (3) they are entitled to qualified immunity, id. at 33-36. In support of these arguments, Defendants submitted Williams'

deposition, the hand-held video recording of the cell extraction, Williams'
disciplinary reports, and the declaration of FSP Assistant Warden William
Bennett. See Doc. 59-1 (Williams' Deposition); see also Docs. 59-2, 59-6. In
response, Williams has submitted the Williams' Statement and the Williams'
Declaration.

In his deposition, Williams testified as follows regarding the cell
extraction:

> [The extraction team took] me into the cell,
> which again they were not supposed to enter the cell
> at the same time that I was in there, and [Defendant]
> Thompson blocked the camera with his back.
> They was [sic] punching me, punching me in
> my testicles, punching me in my stomach, grabbing
> my testicles, punching me, pulling, twisting,
> punching. One of them stuck their finger in my anus
> through the boxers. [Defendant] Scott was sticking
> his finger in my eye trying to press it all the way in.
> He did that to both eyes. I was on my stomach while
> he was doing all of that. [Defendant] Scott was
> pushing his finger in my eye. Whenever he was at the
> top, he was at my head, he was pushing his finger in
> my eye and putting his body weight behind it. Then
> when they get me on my back they were still doing
> the same thing. [Defendant] Scott went for my right
> eye when I was on my stomach, and then when they
> took me to my back he went to my left eye.
> And while they was [sic] doing that they got the
> shackles on [me], the waist chain [on me]. Then they
> backed out with me on my stomach and they closed
> the door. [After that] [t]hey told me to come to the
> door and give them the restraints and that's what I
> did.

See Williams' Deposition at 15-16. In the Williams' Declaration, Williams provides additional detail regarding the cell extraction.[19] Specifically, Williams states that the cell extraction occurred after prison officials made the decision to place him on property restriction for a false reason that his cell was in disarray. See Williams' Declaration at 7. After he packed his personal property, Williams asserts that FSP staff placed him in full body restraints consisting of "leg irons/black box/waist chain" near the shower unit. Id. The FSP extraction team then escorted Williams to cell B-1209 in the bravo housing wing at FSP. Id. Upon arriving at cell B-1209, Williams asserts that Defendant Thompson ordered the extraction team to take Williams inside the cell while Williams was still in full body restraints. Id. Williams alleges that he was aware of a history of FSP staff abusing inmates "while inside of [extraction] cell[s] off camera," and he therefore verbally refused to go inside the cell and held on to the door handle. Id. Williams states the extraction team then "yanked" him inside the cell; Defendant Scott "placed all his body weight on [Williams'] head with his [r]ight hand and repeatedly used his thumb to poke and push [Williams'] right eye . . . [and] when [Williams] was turned on his back, [Scott] then rotated to the left eye as well"; other extraction team members punched and grabbed his "[b]ody

_____

[19] Williams states that he filed the Declaration under penalty of perjury in accordance with 28 U.S.C. § 1746. See Williams' Declaration at 1.

area/private area/neck/face"; and one of the extraction team members "tampered with [Williams'] anus by ramming his finger in [Williams'] anus through his boxers" and squeezed and pulled on Williams' testicles. Id. at 7-8. Williams states the extraction team removed his shackles and waist chain before they left the cell. Id. at 8. Williams alleges he immediately yelled "PREA and staff abuse" after the extraction team left the cell. Id. According to Williams, a nurse responded to the housing wing and questioned Williams at the cell front. Id. Williams refused to exit the cell to go to medical for an assessment because he knew he would be escorted "by the same [defendants] who violated [his] rights." Id.

Turning to the evidence submitted by Defendants, a disciplinary report dated February 9, 2018, states in pertinent part that:

> [Williams] is being charged with 6-1: "Disobeying Verbal or Written Order - Any Order Given to an Inmate or Inmates by a Staff Member or Other Authorized Person", Rule of Prohibited Conduct 33-601.314, FAC. At approximately 7:00am on Friday, February 9, 2018, while assigned as a Foxtrot Wing housing officer, I was conducting a security check and ordered all inmates on all 3 floors to bring their cells into compliance in accord[ance] with the Close Management housing rules. At approximately 7:30am, while conducting formal count procedures with Sergeant R. Anderson, I again ordered all inmates to bring their cells into compliance, at which time Inmate Williams refused. I contacted Lieutenant S. Thompson. Upon his arrival, Lieutenant Thompson observed Inmate Williams' cell and ordered him to bring his cell into compliance at

> which time he refused. The duty Warden, Colonel M.
> Honour was contacted and authorized Inmate
> Williams to be placed on 72-hr property restriction.
> The shift OIC was notified and advised me to follow
> through with this formal disciplinary report as
> provided in section 33-601.303, FAC.

Doc. 59-2 at 4 (cleaned up).

In his declaration, Bennett states in relevant part that on February 9, 2018, Williams received "disciplinary [c]onfinement [for] Disobeying Verbal or Written Order, . . .  Given [t]o an Inmate or Inmates by [a] Staff Member . . ., [in] violation of F.A.C., Rule of Prohibited Conduct 33-601.314." Doc. 59-6 at 4-5. Bennett states that as a result, Williams was transferred from cell "F1317S to B1209" and placed on 72-hour property restriction. Id. at 5.

The hand-held video recording begins at 9:33 a.m. in front of cell F-1317, with an officer, who does not identify himself, providing a historical statement of the situation. The officer states that Williams refused to comply with directives to make his bed and fix his cell, that the officer himself witnessed the cell in disarray, and that Colonel Honour authorized the use of FSP's extraction team. Williams is verbally combative with the officer, cussing at the officer at times, but otherwise complies with the officer's directives to remove his clothing, except for his boxers, and to submit to restraints. At approximately 9:37 a.m., another unidentified officer removes Williams from cell F-1317 and walks him to the end of the cell block where

47

FSP's extraction team is waiting to escort Williams to cell B-1209. Williams is in leg shackles, handcuffs, and waist restraints. Two members of FSP's extraction team take Williams by each arm and escort him downstairs and down a hallway to the cell block where cell B-1209 is located. Although not visible in the recording, following behind them are the other three members of the extraction team.

At timestamp 10:44 in the video, the extraction team reaches the front of cell B-1209 with Williams. The extraction team member who is holding on to Williams' left arm attempts to pull Williams inside the cell. Williams says something to the officers, at which point commands can be heard telling the extraction team to "pull him in there." Williams momentarily holds on to the cell door with one hand to stop the two extraction team members from pulling him inside the cell. Within ten seconds, the two extraction team members have Williams inside the cell and he is seen semi-kneeling on the bunk. A directive is given to "lay [Williams] down and take the leg irons off," at which point the remaining three extraction team members enter the cell. Williams is pushed face-down on the bunk, and four extraction team members are shown holding Williams down as the fifth member stands on top of the bunk to remove the leg restraints. Williams is told "to quit tensing up." After the leg restraints are removed, FSP staff outside the cell hand keys to the extraction team to remove Williams' waist restraints. After the waist

restraints are removed, the extraction team members use a shield and exit the cell. The entire encounter inside cell B-1209 lasts approximately two minutes. Williams then complies with orders to come to the cell door so that his handcuffs can be removed. Williams' cuffs are removed at approximately 9:45 a.m. Williams states he has a PREA complaint, and a nurse approaches his cell door minutes later. Williams refuses to leave his cell so that he can be escorted to medical for an assessment.

Defendants are correct that generally "[w]here [a] video obviously contradicts [a plaintiff's] version of the facts, we accept the video's depiction instead of [the p]laintiff's account." Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1315 (11th Cir. 2010) (citing Scott v. Harris, 550 U.S. 372, 380-81 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). But that is not the situation presented in this case. Upon review of the video, the Court finds Defendants' assertion that the hand-held video recording clearly contradicts Williams' version of the facts to be unavailing. While the video reflects that the encounter is relatively brief and does not appear to be violent, the recording does not foreclose Williams' version of the facts. The view into cell B-1209 is obstructed at times by the extraction team members' bodies. Indeed, due to the position of the

49

extraction team members in relation to Williams' body on the bunk, the video does not allow a viewer to see where some of the Defendants' hands are or what they are doing. Notably for much of the encounter, the viewer cannot see Williams' face – where he claims a defendant poked fingers in his eyes nor can the viewer see his rear – where he alleges that he was sexually assaulted. And because the hand-held camera remains outside cell B-1209 throughout the entire encounter, the Court cannot discern what some of the extraction team members are doing to subdue Williams. Additionally, at various points in the recording, the fifth extraction team member (who removed the leg restraints) stands on top of or in front of the bunk, such that the camera's view of Williams' body is entirely blocked. Indeed, only Williams' feet are clearly visible at some points in the recording. In short, the video recording does not constitute indisputable evidence that contradicts Williams' account of what occurred inside the cell.

Thus, there remain genuine disputes of material fact as to whether Williams resisted the extraction team's efforts during the encounter, and what, if any, force the extraction team applied to subdue Williams. There are also disputed issues of fact regarding whether Defendant Thompson was in a position to intervene.[20] Accepting Williams' version of the events as true,

---

[20] Indeed, because the extraction team members and Defendant Thompson failed to identify themselves on camera, the Court cannot rely on the video

which the Court must at this juncture, the Court concludes that Defendants are not entitled to summary judgment on Williams' exhausted Eighth Amendment claims. See Sconiers, 946 F.3d at 1263 ("Summary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the non-moving party makes, provided they are sufficiently supported by evidence of record. So when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if the only issue is one of credibility, the issue is factual, and a court cannot grant summary judgment.") (internal citations and quotation marks omitted).

As to Defendants' qualified immunity argument, because Williams asserts facts that, accepted as true, would amount to an Eighth Amendment violation under clearly established law, Defendants also are not entitled to the benefit of qualified immunity.[21] See Dobbins v. Giles, 451 F. App'x 849, 851 (11th Cir. 2012) (holding that when a plaintiff asserting an excessive force claim "has alleged facts sufficient to survive a motion to dismiss or a motion for summary judgment demonstrating that the officer used force

recording to ascertain Defendant Thompson's location during the encounter.

[21] In determining whether a defendant is entitled to qualified immunity, courts view the facts and all reasonable inferences in the light most favorable to the plaintiff to the extent supported by the record, and then consider "the legal issue of whether the plaintiff's 'facts,' if proven, show that the defendant violated clearly established law." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000); Scott v. Harris, 550 U.S. 372, 381 n.8 (2007).

maliciously and sadistically to cause harm, he has necessarily established the two prongs required to defeat a defense of qualified immunity") (internal quotation marks omitted); Sconiers, 946 F.3d at 1266 (holding that forceful digital penetration of the prisoner's anus clearly met the objective and subjective components of an Eighth Amendment claim); DeJesus v. Lewis, 14 F.4th 1182, 1196 n.2, 1197 (11th Cir. 2021) (noting that "clothed sexualized touching" may also qualify as a sexual assault in violation of the Eighth Amendment).[22] Thus, Defendants' Motion is due to be denied as to the exhausted Eighth Amendment claims.

## C. De Minimis Injury

Next, Defendants argue that Williams is not entitled to compensatory damages under 42 U.S.C. § 1997e(e) because he cannot demonstrate that he suffered more than de minimis physical injuries resulting from Defendants' alleged actions during the cell extraction. See Motion at 39-42. Pursuant to 42 U.S.C. § 1997e(e), "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." To satisfy § 1997e(e), a

---

[22] Because only some "clothed sexualized touching" qualifies as a sexual assault in violation of the Eighth Amendment, a fact-finder must evaluate on a case-by-case basis whether such allegations constitute a sexual assault in violation of the Eighth Amendment. See DeJesus, 14 F.4th at 1196 n.12, 1197. In this case, such a determination is not possible at the summary judgment stage in light of the disputed issues of material fact.

prisoner must assert a physical injury that is more than de minimis. <u>Brooks v. Warden</u>, 800 F.3d 1295, 1307 (11th Cir. 2015). Alternatively, a prisoner may bring an action for mental or emotional injury with a prior showing of the commission of a "sexual act" as defined in § 2246. Section 2246(2)(D) defines a "sexual act" to include "the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person . . . ." In addition, in cases where a prisoner alleges a sexual assault by a prison official, the Eleventh Circuit has explained:

> In order for a prisoner to meet his burden on all elements of his Eighth Amendment claim, . . . he need only show that the prison official committed a sexual assault. This means that the finders of fact need not consider the amount of force applied, the extent of the injury inflicted, or any effort the official made to temper the severity of the force used. Requiring a jury to make findings about the amount of force or the extent of the injury in cases involving sexual assault improperly suggests that some forms of sexual assault may be de minimis and thus do not rise to the level of an Eighth Amendment violation. <u>Sconiers</u>, 946 F.3d at 1259; <u>see</u> <u>also</u> <u>id.</u> at 1272 (Rosenbaum, J., concurring) ("[P]hysical sexual assaults by correctional officers of inmates violate the Eighth Amendment because no matter how difficult the inmate is, the official is never justified in punishing him in this manner.").

<u>DeJesus</u>, 14th F.4th at 1197.

Here, as discussed above, the video evidence does not foreclose Williams' assertion that an extraction team member sexually assaulted him during the cell extraction by penetrating his anus through his clothing. See Williams' Deposition at 15 (testifying that the extraction team members punched and grabbed his testicles, and that "[o]ne of them stuck their finger in my anus through the boxers"); Williams' Declaration at 8 (asserting that one of the extraction team members "tampered with [Williams'] anus by ramming his finger in [Williams'] anus through his boxers"). In addition, Williams presents evidence that he suffered other physical and mental injuries as a result of the cell extraction. See Williams' Deposition at 16 (testifying that he suffered injuries to his lower back, eyes, waist, hands, arms, and anus); id. at 27 (testifying that his pre-existing mental injuries were exacerbated). Defendants attempt to refute Williams' allegations by supplying his medical records, see Docs. 59-8 to 59-15, as well as the declaration of legal nurse consultant Kellie Caswell, see Doc. 59-8 at 2-4. However, in doing so, they only confirm the existence of issues of fact to be resolved by a jury.

Upon review of the record, the Court concludes there are disputed issues for trial as to whether Williams suffered physical injuries that are more than de minimis. Additionally, if Williams is able to establish at trial that an extraction team member sexually assaulted him during the

54

extraction, he may be able to recover compensatory damages for mental or emotional injuries regardless of whether he sustained physical injuries. As such, the Motion is due to be denied to the extent that the Court finds Williams' request for compensatory damages is not precluded under § 1997e(e).

### D. Punitive Damages

Defendants argue that Williams' request for punitive damages must be dismissed because it is statutorily barred. See Motion at 43-45. According to Defendants, 18 U.S.C. § 3626(a)(1)(A) precludes punitive damages in all civil rights cases because such damages constitute "prospective relief." Id. at 43. In support of their contention, Defendants argue punitive damages "are never necessary to correct a violation of a [f]ederal right." Id. They also contend that even if an award of punitive damages is necessary to correct such a legal violation, that award could not satisfy the PLRA's "stringent limitations" as the relief is neither "narrowly drawn" nor "the least intrusive means necessary to correct the violation of the [f]ederal right." Id. at 44. In response, Williams argues that punitive damages are warranted to "punish [D]efendants for their conduct and deter them . . . from committing similar acts in the future." Response at 7.

Section 3626(a)(1)(A) provides:

> (1) Prospective relief. – (A) Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A). Defendants are correct that punitive damages are considered "prospective relief" under § 3626. See Johnson v. Breeden, 280 F.3d 1308, 1325 (11th Cir. 2002) (holding "punitive damages are prospective relief"), abrogated on other grounds by Kingsley v. Hendrickson, 576 U.S. 389, 395 (2015). But Defendants' argument that punitive damages, as "prospective relief" under § 3626, are precluded in prisoner civil rights actions is misguided. Defendants cite Johnson in support of their argument; but in Johnson, the Eleventh Circuit did not hold that punitive damages were unavailable under § 3626 for § 1983 cases. Instead, in Johnson, the Eleventh Circuit clarified, in the context of a § 1983 civil rights case, that § 3626(a)(1)(A) merely provides the framework for awarding punitive damages. 280 F.3d at 1325. It explained "a punitive damages award must be no larger than reasonably necessary to deter the kind of violations of the federal right that occurred in the case . . . [and] that such awards should be imposed

against no more defendants than necessary to serve that deterrent function and that they are the least intrusive way of doing so." Id.

While the Court is unaware of an Eleventh Circuit case that has addressed Defendants' specific argument here, the Court cannot disregard the Eleventh Circuit's long-standing recognition that punitive damages are available in prisoner civil rights actions. Indeed, the Eleventh Circuit has held that 42 U.S.C. § 1997e(e) permits claims for punitive damages for § 1983 claims without a physical injury requirement. Hoever v. Marks, 993 F.3d 1353, 1364 (11th Cir. 2021). And it has held "[p]unitive damages are appropriate in § 1983 cases 'where a defendant's conduct is motivated by evil intent or involves callous or reckless indifference to federally protected rights." Barnett v. MacArthur, 715 F. App'x 894, 905 (11th Cir. 2017). In addition, the Eleventh Circuit Civil Pattern Jury Instructions on § 1983 damages include an instruction on awarding punitive damages. See Eleventh Circuit Pattern Jury Instruction, Civil Cases, Civil Rights—42 U.S.C. § 1983 Claims—Damages § 5.13.

The Court also finds persuasive other district court decisions explicitly finding that § 3626(a)(1)(A) does not preclude an award of punitive damages in prisoner civil cases. See, e.g., Brown v. Semple, No. 3:16-cv-376, 2018 WL 4308564, at *14 (D. Conn. Sept. 10, 2018) (collecting cases); Douglas v. Byunghak Jin, No. 11-0350, 2014 WL 1117934, at *4-5 (W.D. Penn. Mar. 20,

2014) (reasoning that if Congress "intended to abolish punitive damages in all prisoner litigation under the PLRA, it would have done so directly, and in much plainer terms"). Thus, the Court finds that § 3626 does not preclude a request for punitive damages in this § 1983 action, and the Motion is due to be denied on this issue.

Accordingly, it is now

**ORDERED:**

1.  Williams' "Reply and Objection(s) to Defendant's Reply to Plaintiff's Response(s) to Defendant's Motion for Summary Judgment" (Doc. 73) is **STRICKEN**.

2.  Defendants' Motion for Summary Judgment (Doc. 59) is **GRANTED in part and DENIED in part**. The Motion is **GRANTED** to the extent Williams failed to exhaust his: (1) Eighth Amendment claim against Officer Thompson for placing Williams on strip status between January 17th to 20th, 2018, and February 9, 2018, to March 6, 2018; (2) First Amendment retaliation claim against Officer Thompson; and (3) Eighth Amendment claim against Warden Reddish. These claims are **dismissed without prejudice**. In addition, Williams' request for injunctive relief is **dismissed as moot**. In all other respects, the Motion is **DENIED**.

3.  The **Clerk** is directed to terminate Warden Reddish as a Defendant in this case.

4.    This case is in a posture to proceed to a settlement conference and, if settlement negotiations fail, to trial. At this stage of the proceedings, the Court finds Williams is entitled to the appointment of counsel to assist him. See 28 U.S.C. § 1915(e)(1); Bass v. Perrin, 170 F.3d 1312, 1320 (11th Cir. 1999). Thus, this case is **REFERRED** to the Jacksonville Division Civil Pro Bono Appointment Program so the designated deputy clerk of the Court may seek counsel to represent Williams. Due to the limited resources of the program, the process of finding counsel may take some time. Therefore, the **Clerk** is directed to stay and administratively close this case **for sixty (60) days**, to allow the Court time to find a lawyer to represent Williams.

5.    The parties may engage in settlement negotiations while the case is stayed and administratively closed, if they choose to do so. If settlement negotiations are successful, the parties shall immediately notify the Court.

**DONE AND ORDERED** at Jacksonville, Florida, this 30th day of August, 2024.

**MARCIA MORALES HOWARD**
United States District Judge

Jax-10  08/20
C:    Andrew L. Williams, #E24132
      Counsel of record